## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **THOMAS T.,**[1] | ) | |
| | ) | **No. 18 CV 3259** |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,** | ) | |
| | ) | **May 15, 2019** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

Thomas T. seeks supplemental security income ("SSI") and disability insurance benefits ("DIB") based on his claim that he is disabled by severe impairments including degenerative disc disease of the lumbar and cervical spine, joint disease of the lumbar spine, and osteoarthritis of the left knee. After the Commissioner of Social Security denied his applications, Thomas filed this lawsuit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Thomas's motion is granted, the government's is denied, and the matter is remanded:

### Procedural History

On October 23, 2014, Thomas applied for SSI and DIB, alleging that he had become disabled two weeks earlier, on October 7, 2014. (Administrative Record

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect his privacy to the extent possible.

("A.R.") 192, 198.)    After his applications were denied initially and upon reconsideration, (id. at 65-66, 117-18), Thomas sought and was granted a hearing before an administrative law judge ("ALJ").  Thomas appeared with his attorney at his February 2017 hearing.  (Id. at 35-64.)  In May 2017 the ALJ issued a decision concluding that Thomas is not disabled.  (Id. at 14-28.)  When the Appeals Council denied Thomas's request for review, (id. at 1-7), the ALJ's decision became the final decision of the Commissioner, *see Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017).  Thomas filed this lawsuit seeking judicial review of the Commissioner's decision, *see* 42 U.S.C. § 405(g), and the parties have consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 26).

## Facts

Thomas was working as a carpenter in 2008 when he suffered an on-the-job injury to his neck.  After receiving workers' compensation for a few years, Thomas worked as a carpenter on an independent contractor basis, but he says that his ability to work full-time was limited after his injury.  He finally stopped working in October 2014.  Two weeks later and seven months before his 50th birthday, Thomas filed his DIB and SSI applications.

### A.    Medical Evidence

The relevant medical records begin when Thomas underwent back surgery with Dr. Stanford Tack in 2005.  (A.R. 664.)  A January 2008 lumbar spine MRI showed a small central disc bulge or herniation.  (A.R. 421-22.)  Thomas did not return to Dr. Tack for further treatment after 2008 until 2014.  (Id. at 433.)

In the meantime, Thomas sought treatment with his primary care physician, Dr. Andrew Savin. In July 2011 Dr. Savin noted that Thomas was taking Abilify to help with depression and fatigue. (Id. at 480.) Dr. Savin also noted in April 2012 that Thomas was sleeping only four to six hours per night, (id. at 481), but the following month a review of his symptoms was negative, other than ongoing malaise and fatigue, (id. at 478). In September 2013 Thomas complained that he was experiencing lower back pain that radiated to his legs, and Dr. Savin prescribed hydrocodone-ibuprofen. (Id. at 469-71.) Thomas followed up with Dr. Savin in April 2014 and was still very fatigued but had no other significant complaints. (Id. at 546.)

In June 2014 Thomas returned to Dr. Tack after a six-year hiatus, complaining that he had been experiencing exacerbated neck pain for six days after engaging in lifting. (Id. at 433.) Dr. Tack noted that Thomas had mild stiffness in his spine, but no radicular or neurologic symptoms and he exhibited a full pain-free range of motion in his shoulders. (Id.) Dr. Tack prescribed a Medrol Dosepak. (Id.)

In October 2014, the month Thomas claims his disability began, Thomas returned to Dr. Tack again complaining of neck pain, as well as radicular pain in the left upper extremity and numbness in his thumb and finger. (Id. at 432.) Dr. Tack ordered an MRI of the cervical spine, which revealed moderate left central spinal stenosis and moderately severe left proximal neural foraminal stenosis, secondary to left parasagittal and foraminal disc herniation superimposed on a mild generalized disc osteophyte complex. (Id. at 599.) It also revealed mild progression

of degenerative disc changes along several sections of the cervical spine. (Id.) Dr. Tack noted that Thomas's symptoms were poorly controlled and that he was having difficulty in any upright position because of his aggravated neck and shoulder pain. (Id. at 431.) Dr. Tack discussed both surgery and more conservative treatment options and Thomas opted for conservative treatment measures. (Id.)

On October 20, 2014, Thomas received an epidural steroid injection in the cervical spine from Dr. Demetrios Louis. (Id. at 392.) In his notes Dr. Louis observed that Thomas was having pain from his neck to left shoulder but noted that there was no muscle weakness or spasms, and no joint pain or swelling in Thomas's extremities. (Id. at 447-48.) Eleven days later Thomas was examined by one of Dr. Tack's colleagues, Dr. Mark Mikhael. (Id. at 663-65.) Thomas reported that his neck and shoulder pain had been getting progressively worse over the past month, and that Vicoprofen was providing only minimal relief. (Id. at 663.) Dr. Mikhael attributed Thomas's symptoms to a left-sided disc herniation that was compressing the nerve root at C3-C4 and agreed with Dr. Tack that it was "reasonable to attempt to treat this conservatively" before weighing surgical options. (Id. at 664.)

In November 2014 Thomas received two cervical steroid injections. After the first injection, he reported to Dr. Tack that he had no response and was very symptomatic with neck and shoulder pain. (Id. at 430.) At his appointment for the second injection, Thomas reported that his pain was at a seven out of ten and that he was only getting a mild benefit from Medrol Dosepaks and Vicoprofen. (Id. at 443-44.) The treating doctor reported that Thomas nonetheless had a full range of

motion in his spine and upper extremities. (Id. at 444.) After the second injection, Thomas reported to Dr. Tack that it had been "dramatically helpful" for his neck and shoulder pain, but that he was experiencing pain in his left lower extremity, especially the knee. (Id. at 428.) Dr. Tack noted that Thomas showed a full range of motion and that his straight leg raising was "unremarkable," but gave him a trial intraarticular steroid injection for his knee pain. (Id.) Two days later Thomas reported to Dr. Savin that he had been experiencing chronic back and neck pain since April 2013, but that he was at that time "working on a house." (Id. at 535-36.)

In January 2015 Thomas underwent a psychological consulting examination with Gregory Rudolph, Ph.D. (Id. at 607.) Dr. Rudolph noted that Thomas had not received any mental health treatment other than being prescribed anti-depressants by his primary care physician. (Id.) Dr. Rudolph observed Thomas as having no difficulty walking to and from his office, as having an in-tact memory and upbeat mood, and as displaying no evidence of depression during the interview. (Id. at 608.) Thomas denied having suicidal thoughts, problems with anxiety and anger, or "vegetative symptoms." (Id. at 609.)

In March 2015 Thomas reported to Dr. Savin that he was "more depressed" and tired, and that he had started the process for disability benefits. (Id. at 628.) Dr. Savin increased his Zoloft prescription and recommended follow-up with an orthopedic surgeon. (Id. at 630.) Two days later Dr. Tack reevaluated him for neck and knee pain. (Id. at 613.) Dr. Tack noted that Thomas was taking Vicoprofen every day but that he was not symptomatic enough to consider surgery. (Id.)

Dr. Tack declined Thomas's informal request to fill out a disability form and counseled that he needed a better approach to long-term pain management than simply refilling pain medications. (Id.) In June 2015 Thomas reported to Dr. Tack that he had gotten excellent relief for six months after his last knee injection. (Id. at 671.) But at that point his symptoms were recurring, and he was having mild crepitation in the knee, along with difficulty sleeping. (Id.)

Two consulting physicians completed residual functional capacity ("RFC") assessments after reviewing the medical records available through February 2015 and June 2015, respectively. Dr. James Hinchen noted that: Thomas's depression was a non-severe impairment that did not meet diagnostic criteria; he had not received specialized mental health treatment; and there was no mention in the records of any problems caused by depression or concentration issues. (Id. at 71-73.) As for his physical limitations, Dr. Hinchen believed the records supported a finding that Thomas could perform light work, with the ability to lift and carry 20 pounds occasionally and 10 pounds frequently but limited in his ability to reach overhead. (Id. at 75.) In June 2015 Dr. Prasad Kareti reviewed Thomas's records and agreed with Dr. Hinchen's RFC assessment. (Id. at 102.)

In July 2015 Dr. Tack recommended that Thomas see an arthroscopic specialist after another epidural injection failed to provide lasting relief for his knee pain. (Id. at 672.) The next month Thomas began seeing Dr. Peter Thadani for treatment of his knee pain. (Id. at 673.) Dr. Thadani began a course of treatment with orthovisc injections, but after each of the three rounds Thomas denied any

improvement. (Id. at 675-77.) In February 2016 Thomas finally underwent knee surgery to deal with severe medial compartment osteoarthritis in his left knee. (Id. at 938.) He was discharged after spending one night in the hospital and referred for a course of physical therapy. After less than three weeks of physical therapy, Thomas reported that he was relatively pain free and could flex his knee further than ever, but that he continued to have difficulty with climbing stairs because of muscle weakness. (Id. at 1089.)

In January 2017 Thomas had a single visit with Dr. Alfonso Bello, a rheumatologist, at which he reported numbness and tingling in his hands and wrists with occasional radicular symptoms down his left leg. (Id. at 1108.) Dr. Bello observed that Thomas had a limited range of motion in his neck and in his cervical and lumbar spine. (Id.) He observed tenderness in both of Thomas's shoulders and a limited range of motion in the right shoulder. (Id.) Dr. Bello further noted that Thomas had tenderness in both of his knees but a full range of motion and normal gait. (Id. at 1108-09.) Dr. Bello opined that Thomas was suffering from postlaminectomy syndrome, with "concern for possible evolving polymyalgia rheumatica." (Id. at 1109.) Dr. Bello ordered lab tests, but no results were made part of the record.

The day before Thomas was scheduled to appear for his hearing before the ALJ, Dr. Bello completed an RFC assessment form, in which he opined that Thomas's symptoms produce significant limitations. (Id. at 1103.) He asserted that Thomas's pain would frequently interfere with concentration, and that Thomas can

sit for only about two hours a day and stand or walk for less than two hours a day. (Id. at 1104-05.) Dr. Bello further opined that Thomas would need a sit-stand option and must walk for five minutes *every five minutes* throughout the day. (Id. at 1105.) Moreover, according to Dr. Bello, Thomas would have to take three unscheduled breaks for 10 minutes each during the course of a work day, and his symptoms would likely cause him to be absent from work more than four days a month. (Id. at 1105-06.)

**B.    Hearing Testimony**

At his February 2017 hearing Thomas described the ways in which his neck, knee, and back pain limit him. Thomas said that he has sharp pain in the back of his neck that prevents him from turning his neck in either direction. (Id. at 45.) He said that he had not had treatment for his neck pain since January 2015 because "[i]t hasn't been to the point where I've needed [it], I guess, for the most part." (Id. at 47.) Thomas testified that he has tenderness in his low back, sharp pain in his left hip, and numbness in his left leg. (Id.) Thomas said that after his knee replacement surgery in 2016, his knee is still painful with lots of popping and snapping. (Id. at 51.) Thomas testified that bending, lifting, standing, and walking exacerbate his pain. (Id. at 48.)

When asked about his daily activities, Thomas testified that he spends most of the day lying down and watching television. (Id. at 53.) He said that he takes Vicodin several times a week when his pain is "really bad," but it causes him to feel nauseous and sleepy. (Id. at 51-52.) He also explained that he has difficulty

sleeping at night and so he naps every day for an hour or two.  (Id. at 55.)  Thomas

said that he can sit for only 15 to 25 minutes without being in excruciating pain,

can stand for only 20 minutes before he has to move around, and can walk for no

more than a block.  (Id. at 54.)  Thomas said that he is unable to work because of his

pain and because his medication leaves him "in a fog."  (Id. at 56.)

A vocational expert ("VE") also testified at the hearing and answered a series

of hypothetical questions the ALJ posed about the kinds of jobs a person with

certain specific limitations could perform.  The VE first testified that Thomas is a

"person closely approaching advanced age" under the social security regulations, but

for each one of the hypothetical questions, the ALJ asked the VE to assume a

"younger individual" with Thomas's education level and skills.  (Id. at 58-59.)  When

asked to assume that such a person were limited to light work, occasionally lifting

20 pounds and frequently lifting 10, who could occasionally stoop but never kneel,

crouch, or crawl, who could not operate foot controls with the left foot and who was

limited to no overhead reaching with the left arm, the VE testified that the

hypothetical individual could perform jobs such as cashier, cafeteria attendant, and

hand packager.  (Id. at 59-60.)  The VE also testified that a person who is off-task

for more than 15 percent of the day or who misses four or more days per month

would be unable to engage in competitive work.  (Id. at 62-63.)

## C.    The ALJ's Decision

The ALJ followed the standard five-step sequence in evaluating Thomas's

DIB and SSI claims.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  At step one the ALJ

found that Thomas has not engaged in substantial gainful activity since his alleged disability onset date, and at step two he determined that Thomas's severe impairments include degenerative disc disease of the cervical spine, degenerative disc and joint disease of the lumbar spine, and osteoarthritis of the left knee. (A.R. 16.) The ALJ noted that Thomas has a medically determinable mental impairment in the form of depression but concluded that his depression is not severe. (Id. at 18.) At step three the ALJ concluded that Thomas's impairments do not meet or medically equal the severity of any Listing, whether considered individually or in combination. (Id. at 18-19.)

Before turning to step four, the ALJ concluded that Thomas can perform light work with some additional limitations, including never operating foot controls with his left leg and foot and never reaching overhead with his left arm. (Id. at 19.) In explaining this conclusion, the ALJ attributed little weight to the RFC assessment Dr. Bello prepared and gave significant weight to the RFC assessments the state consulting physicians submitted. (Id. at 24-25.) At step four the ALJ determined that Thomas's RFC prevents him from returning to his past relevant work as a carpenter, but at step five he concluded that Thomas can perform other jobs. (Id. at 27-28.) Accordingly, the ALJ concluded that Thomas is not disabled.

## Analysis

Thomas argues that the ALJ committed reversible errors by improperly discounting Dr. Bello's RFC opinion, failing to incorporate all of his limitations into the RFC assessment, and posing inaccurate hypothetical questions to the VE. In

reviewing the ALJ's decision, this court does not weigh the evidence itself, but instead ensures that the ALJ applied the correct legal standards and that his analysis is supported by substantial evidence. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Substantial evidence means "more than a mere scintilla" of evidence, but no more than "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotations and citations omitted). In applying that standard, the court must be careful not to "displace the ALJ's judgment," and must affirm an adequately supported decision even if reasonable minds could disagree as to whether the evidence suggests that the claimant is disabled. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (quotation and citation omitted).

## A.    Dr. Bello's Opinion

Thomas argues that the ALJ erred in rejecting Dr. Bello's medical opinion because, he says, the ALJ failed to support that aspect of his decision and "played doctor" by assuming that Dr. Bello could not assess his patient's RFC after only one examination. Thomas characterizes Dr. Bello as both an examining and a treating physician, but it is undisputed that Thomas saw Dr. Bello only once before his hearing with the ALJ. The ALJ found that Dr. Bello was "more of an examining physician" than a treating doctor, (A.R. 24), but nonetheless analyzed the regulatory factors that apply to treating sources in weighing Dr. Bello's opinion.[2]

---

[2]    Although the rules for weighing medical opinions have changed for disability claims filed beginning March 27, 2017, *see* 20 C.F.R. § 404.1520c, Thomas filed his applications before that date. Accordingly, the treating physician rule set out in 20

*See* 20 C.F.R. § 404.1527(c). Those factors include the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability of the doctor's findings based on medical signs and laboratory findings, the consistency of the doctor's opinion with the record as a whole, and the doctor's specialization. *Id.*

The ALJ gave a number of thoroughly supported reasons for his decision to afford Dr. Bello's opinion little weight. First, he explained that Dr. Bello and Thomas did not have a lengthy treatment relationship because Dr. Bello's assessment was based on a one-time examination. (A.R. 24.) The ALJ then noted that Dr. Bello is a rheumatologist, and that the evidence does not suggest that this specialization is particularly pertinent to evaluating Thomas's symptoms because at the time of the single examination there were no laboratory tests in the record pointing to a rheumatologic impairment. (Id.) The ALJ then noted that even if Thomas had a rheumatologic impairment, it is unclear how Dr. Bello's examination of Thomas supports the conclusion that his impairments were "difficult [to] treat, unresponsive to treatment, or progressive." (Id.) The ALJ found such conclusion difficult to square with Dr. Bello's observations that Thomas had no active signs of inflammation and few objective findings. (Id.) Most important to the ALJ was a lack of consistency between Dr. Bello's "conclusory" opinion and his exam findings, including the inconsistency between the significant limitations Dr. Bello assigned Thomas and his findings that Thomas's sensation was within normal limits, his gait

---

C.F.R. § 404.1527 still applies here. *See Winsted v. Berryhill*, __ F.3d __, 2019 WL 1941179, at *6 n.2 (7th Cir. Feb. 8, 2019).

was normal, his straight leg raise was negative, and his reflexes intact. (Id.) In other words, the ALJ diligently applied the relevant regulatory factors of specialization, supportability, length of treatment, and consistency in explaining why he was unpersuaded by the extreme limitations in Dr. Bello's RFC assessment. *See* 20 C.F.R. § 404.1527.

Thomas now attacks the ALJ's handling of Dr. Bello's opinion on two grounds.[3] First, he argues that if a lack of laboratory results drove the decision to discount Dr. Bello's findings, the ALJ should have contacted the doctor to have the lab results added to the record. But the burden is on Thomas to put forth evidence supporting his disability claims, *see Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017), and although the ALJ left the record open after the hearing to allow Thomas to submit additional records, (A.R. 63-64), Thomas apparently did not do so. Moreover, the ALJ is only required to contact a physician if the available evidence is inadequate to allow the ALJ to render a decision. *See Britt v. Berryhill*, 889 F.3d 422, 427 (7th Cir. 2018). The ALJ here had adequate information on which to rest his analysis of Dr. Bello's opinion, especially because he wrote in his decision that even if the lab results were available, he still would discount Dr. Bello's opinion because there is no suggestion or evidence showing that Dr. Bello relied on lab results to inform his opinion. Accordingly, there was no need for the ALJ to contact Dr. Bello before issuing his decision.

---

[3] Thomas also includes a one-sentence argument that the ALJ impermissibly "rejected the opinions of the State agency consultants," (R. 8, Pl.'s Mem. at 15), but that assertion is erroneous, because the ALJ explicitly gave those opinions "significant weight," (A.R. 25).

The only other argument Thomas raises on this point is his assertion that the ALJ impermissibly "played doctor" by writing that "it seems unlikely that even the most experienced rheumatologist . . . could infer an impairment that was difficult [to] treat, unresponsive to treatment, or progressive" after only one examination. (A.R. 24.) But again, the frequency of examination leading up to an opinion is a permissible regulatory factor for the ALJ to consider, *see* 20 C.F.R. § 404.1527(c), and here, the ALJ also explained how Dr. Bello's findings after a single examination were out of proportion to his assignment of a "guarded" prognosis. (A.R. 24.) For these reasons, Thomas has not shown that the ALJ erred in discounting Dr. Bello's RFC opinion.

## B.    The RFC Assessment

Thomas next argues that the ALJ failed to adequately account for his neck immobility, obesity, depression, and polymyalgia rheumatica when crafting the RFC. Specifically, Thomas first argues that it is "particularly curious that the ALJ omitted any limitation for neck rotation" because, according to him, the objective records "overwhelmingly" support a limitation to only occasional neck rotation, which the VE said would eliminate all jobs. (R. 8, Pl.'s Mem. at 10.) Thomas supports that argument by listing evidence of his degenerative changes in the cervical spine, but nowhere does he show that the neck pain associated with those changes requires a limitation to only occasional neck rotation. He points to no medical opinion with respect to his neck-rotation abilities, and he fails to acknowledge that the ALJ addressed the records that demonstrate Thomas had

waxing and waning neck pain. The ALJ explained that other than assigning lifting and reaching limitations, the evidence of his neck pain did not support greater restrictions because Thomas himself denied having sought or needing treatment for his neck in over two years. (A.R. 25.) In light of that evidence, Thomas has not shown that his neck pain required greater limitations than those the ALJ assigned.

Turning to his non-severe impairments, Thomas argues that the ALJ failed to properly account for deficiencies that could be attributed to his depression and medication side effects. Specifically, he argues that given his chronic fatigue, the ALJ did not adequately explain why he found only mild limitations in Thomas's ability to understand, remember, or apply information and his ability to maintain concentration, persistence, or pace. As an initial matter, to the extent his argument here relies on his assertion that the ALJ ignored Dr. Bello's RFC assessment in evaluating the impact of his chronic fatigue, the ALJ gave a thorough and well-supported explanation for why that assessment deserves little weight as explained above. Other than that, Thomas does not point to specific evidence that his fatigue results in limits beyond those assigned by the ALJ, nor does he explain what appropriate limitation the ALJ failed to include.

And contrary to Thomas's argument, the ALJ adequately explained why he considered Thomas's mental health limitations to be no more than mild. The ALJ noted that in the most detailed mental status exam in the record, consulting examiner Dr. Rudolph concluded that Thomas showed no signs of depression or "vegetative symptoms." (Id. at 17.) The ALJ noted that Thomas had never sought

specific mental health treatment beyond the antidepressant prescription his primary care physician provided. (Id.) The ALJ also noted that Thomas interacted appropriately with physicians and did not report any social difficulties, did not frequently complain about medication side effects to his physicians, and attributed his problems to his physical limitations, not mental health problems. (Id. at 18.) As for his fatigue, contrary to Thomas's argument, (R. 8, Pl.'s Mem. at 11), the ALJ acknowledged this symptom, noting that Thomas testified to experiencing "extreme drowsiness," but pointed out that the medical records are not significant for "excessive sedation or problematic medication side effects," (A.R. 20, 26). The ALJ also explained that after his disability onset date Thomas told his doctor that he did not have fatigue or sleep disturbance. (Id. at 22.) The ALJ did not ignore Thomas's fatigue complaints, but rather adequately explained why he concluded that the record does not support additional fatigue- or depression-related RFC limitations.

Thomas next argues that the ALJ failed to consider the impact of his mild obesity in combination with his other impairments. (R. 8, Pl.'s Mem. at 12-13.) According to Thomas the ALJ did not draw a sufficient "logical connection" between his obesity and "possible exacerbation of his musculoskeletal abnormalities." (Id. at 13.) But Thomas has not said what additional limitations the ALJ should have included in the RFC assessment to accommodate his mild obesity. *See Stepp*, 795 F.3d at 720 (finding ALJ's failure to even mention obesity harmless where claimant did not explain its impact on her ability to work). The ALJ noted that no physician expressed any serious concerns about Thomas's weight and Thomas himself did not

describe any limitations he attributed to obesity.  (A.R. 16.)  The ALJ also noted that Thomas's weight ranged from overweight to mildly obese in the relevant period and considered that impairment in assessing the RFC.  (Id. at 16, 26.)  That was sufficient to discharge his duty to consider the impact of Thomas's non-severe obesity in combination with his severe impairments.  *See Kittelson v. Astrue*, 362 Fed. Appx. 553, 557 (7th Cir. 2010) (noting that ALJ's references to obesity in recounting medical history was enough to show "that he was aware of and considered them, so any error in not highlighting them was harmless").

Thomas's final argument with respect to the RFC limitations is that, according to him, the ALJ erred in concluding at step two that his rheumatological condition did not meet the 12-month durational requirement and did not amount to a medically determinable impairment.  But the ALJ adequately explained the basis for this determination by pointing out that after Dr. Bello examined Thomas once he indicated a "concern for possible evolving polymyalgia rheumatica" and noted that Thomas needed to undergo lab work, but the lab results were never made part of the record.  (A.R. 17, 1109.)  The ALJ went further and explained that even if there were lab results consistent with polymyalgia rheumatica, because Thomas first saw a rheumatologist and received this possible diagnosis within a month of the hearing, that impairment did not meet the 12-month durational requirement.  (Id. at 17.)  Thomas attacks that assertion by pointing out that he told Dr. Bello that his symptoms were gradually worsening and by arguing that Dr. Bello's use of the word "evolving" in connection with an impression of "possible" polymyalgia

rheumatica shows that his symptoms likely would last more than 12 months. (R. 8, Pl.'s Mem. at 13.) But the ALJ correctly explained that no doctor had made a conclusive diagnosis of this condition, and Thomas did not submit lab results or other evidence that would support a finding that polymyalgia rheumatica was a condition that was likely to last for 12 months or longer. And again, Thomas fails to point to any additional limitation that the ALJ should have, but did not, include in the RFC to accommodate any symptoms stemming from this condition. *See Summers*, 864 F.3d at 527 (noting that burden is on claimant to prove disability). For these reasons, the court finds that the ALJ adequately supported the RFC assessment.

## C.     The VE Hypotheticals

Thomas's remaining argument is that the ALJ's decision should be reversed because the ALJ mischaracterized his age category in the hypothetical questions he posed to the VE at the hearing. At the time Thomas applied for DIB and SSI he was 49 years old, making him a younger individual under the applicable regulations, but by the time of the hearing he had turned 50 years old, putting him in the category of an individual closely approaching advanced age. *See* 20 C.F.R. § 404.1563. Thomas points out that under the Medical Vocational Grid Rule 201.10, a person of his educational level and skill set who is approaching advanced age and limited to sedentary work is considered conclusively disabled. He also correctly points out that in each hypothetical posed to the VE, the ALJ asked her to assume a "younger individual" instead of an individual approaching advanced age.

Accordingly, he argues that the VE's testimony is fatally flawed because it is not responsive to an accurate medical and vocational profile. (R. 8, Pl.'s Mem. at 9-10.)

The first of Thomas's arguments here is unpersuasive, because it is premised on the notion that he would be presumptively disabled under the Grid if he had been limited to sedentary work. But the ALJ found him capable of light work, and as explained above, that conclusion is supported by substantial evidence. The Grid directs a finding of not disabled for a person of Thomas's education and skill set who can engage in a full range of light work whether he is a younger individual or an individual closely approaching advanced age. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 2 §§ 202.10, 202.17. Accordingly, even if the Grid were applicable here, it would not direct a finding of disability for Thomas regardless of the applicable age category.

However, Thomas's second argument—that the ALJ's step-five conclusion rests on flawed VE testimony—presents a closer call. Because the ALJ determined that Thomas has additional, non-exertional limitations beyond a restriction to light work, he appropriately sought the assistance of a VE in determining what jobs might be available to a person with Thomas's RFC. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). At the hearing, the ALJ first asked the VE to confirm that Thomas is a "person closely approaching advanced age," and she did. (A.R. 58.) But then with respect to each hypothetical the ALJ posed to the VE, he asked her to assume a person who is a "younger individual." (Id. at 59.) Although the ALJ had just confirmed that Thomas falls in the older category, no one at the hearing—not the

ALJ, the VE, or Thomas's attorney—pointed out the mistake or clarified that the hypothetical questions should describe a person closely approaching advanced age.

The question now is whether the ALJ's error in describing Thomas's age category in the hypothetical posed to the VE is harmless. Neither party has cited any authority to guide the court's analysis of that question. This court's own research suggests that there is a conflict among other courts in how to analyze this type of error. At least one court has held that because the relevant age categories pertain to the Grids, where an ALJ relies on a VE's testimony at step five rather than applying the Grids, "even if the ALJ erroneously placed Plaintiff in the wrong age group for the hypothetical, such error was harmless." *Pennington v. Colvin*, No. 3:14-cv-27-J-JRK, 2015 WL 5178409, at *7 (M.D. Fla. Sept. 4, 2015). Similarly, the Eleventh Circuit has suggested that the treatment of a person's age category "is essentially theoretical" where a VE testifies that a person with the claimant's RFC can perform work that exists in significant numbers. *See Miller v. Comm'r of Soc. Sec.*, 241 Fed. Appx. 631, 635 (11th Cir. 2007). And at least one court has held that as long as the VE was aware of the claimant's actual age, any error in failing to inform the VE of the claimant's age category would be harmless. *See Flores v. Astrue*, No. 5:09-CV-214-BG ECF, 2010 WL 3858173, at *5 (N.D. Tex. Aug. 30, 2010)

But a number of other courts, including one from this district, have concluded that where an ALJ includes the wrong age category in a hypothetical posed to a VE, the ALJ's reliance on the VE's response to that question amounts to reversible

error. For example, in *Taylor v. Astrue*, No. 09 CV 970, 2010 WL 4811903, at *9-*10 (N.D. Ill. Nov. 17, 2010), the court found that where an ALJ incorrectly identified a claimant's age in a hypothetical to the VE, the error was not harmless because it prevented the VE from accounting for age-related difficulties the claimant was likely to experience in adjusting to new work. Similarly, in *Dozier v. Colvin*, No. 4:14-CV-93-FL, 2015 WL 3791349, at *5 (E.D.N.C. June 17, 2015), the ALJ posed hypotheticals to the VE placing the claimant in the younger person category, even though for at least part of the relevant period the claimant fell into the closely-approaching-advanced-age category. The court noted that it "cannot properly speculate as to what the VE's testimony would have been" in response to questions the ALJ did not pose, and accordingly concluded that the ALJ's failure to ask the VE about jobs available to a person in the older age category amounted to reversible error. *Id.* Another court reasoned that VE testimony cannot provide substantial evidence to support an ALJ's non-disability finding where the hypothetical described an inaccurate age category. *See Haley v. Comm'r of Soc. Sec.*, No. 1:11-cv-755, 2013 WL 706174, at *6 (W.D. Mich. Jan. 29, 2013). Still another court remanded an ALJ's decision where it was unclear whether the VE's testimony accounted for a claimant's transition between age categories, noting that the VE's testimony must relate "with precision" to the claimant's "exact vocational profile." *Hergenreder v. Colvin*, No. 14-1007-EFM, 2015 WL 5604272, at *9 (D. Kan. Sept. 23, 2015).

Because the government bears the burden of establishing that other jobs exist in the national economy that Thomas can perform, *see Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003), and because here the government has not pointed to any evidence that the VE's testimony about available jobs would have been the same if the ALJ's hypothetical accurately described Thomas's age category, the court concludes that a remand is warranted. The applicable regulations make clear that the ability of a claimant to adjust to other jobs is seriously impacted by his transition from the younger person age category to the closely approaching advanced age category. *See* 20 C.F.R. § 404.1563(d). And the claimant's age is among the vocational factors the ALJ is required to consider at step five. 20 C.F.R. § 404.1563(a). Because the ALJ's step-five conclusion rests on VE testimony that did not accurately reflect Thomas's age, the court concludes that it lacks the support of substantial evidence. Accordingly, a remand is required only for the purpose of allowing the ALJ to reevaluate whether Thomas can perform gainful work that exists in significant numbers in the national economy after considering VE testimony that reflects his accurate vocational profile. To be clear, this limited remand order applies only to the step-five analysis as of the date that Thomas transitioned to the closely approaching advanced age category.

**Conclusion**

For the foregoing reasons, Thomas's motion for summary judgment is granted, the government's is denied, and the case is remanded for further proceedings in accordance with this opinion.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**